FILED
CHARLOTTE, NC

JUN 1 6 2026

US DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. **5:26-cr-13-MEO** |
| | ) | |
| v. | ) | **BILL OF INDICTMENT** |
| | ) | |
| MARTY CHRISTOPHER McDANIEL | ) | 18 U.S.C. § 371 (Conspiracy) |
| | ) | |
| and | ) | |
| | ) | |
| KENNY PRICE | ) | |
| | ) | |

THE GRAND JURY CHARGES:

At all relevant times:

### Introduction

1.      From at least in or about 2020 through at least in or about 2024, in Catawba County, and elsewhere, the defendants, MARTY CHRISTOPHER McDANIEL ("McDANIEL") and KENNY PRICE ("PRICE"), knowingly conspired with each other, and others known and unknown to the Grand Jury, to engage in the transportation of stolen and fraudulently obtained retail products, goods, wares, and merchandise in interstate commerce and foreign commerce through McDANIEL's business, The Gold King ("TGK").

2.      McDANIEL, PRICE, and their coconspirators, purchased retail products from boosters knowing that such products were stolen and fraudulently obtained from stores in the Hickory, North Carolina area and elsewhere.  McDANIEL and PRICE paid the boosters a fraction of the retail price of the stolen and fraudulently obtained goods they delivered to TGK.

3.      McDANIEL, PRICE, and their coconspirators then resold the stolen and fraudulently obtained retail products, goods, wares, and merchandise through various e-commerce stores such as eBay.com, Mercari.com, and Whatnot.com, earning more than $580,000 from the sales.

### Relevant Background

4.      McDANIEL was a resident of Hickory, North Carolina.

5.      PRICE was a resident of Conover, North Carolina.  PRICE worked for McDANIEL at TGK.

6.      TGK, located in Hickory, North Carolina, was approved to buy and sell precious metals as well as antiques but was not a licensed pawn shop.  McDANIEL operated his fencing

1

operation, in part, from TGK, and it was the primary place where boosters dropped off stolen retail goods for McDANIEL and PRICE to purchase.

7.      McDANIEL, along with his coconspirators, operated the scheme through a variety of corporate entities he controlled, including but not limited to, Gold King Jewelry and Coins, LLC, Gold King NC, Inc., Gold King, Inc., Infinity Gaming, and Antiques in the Valley, LLC ("business entities"). Many of these business entities were registered with the North Carolina Secretary of State. McDANIEL was listed as the President of Gold King, Inc. and another known individual was listed as either Manager or President of Gold King Jewelry and Coins LLC, Antiques in the Valley LLC, and Gold King NC, Inc.

8.      A "booster" was a person who stole goods and merchandise from retail stores. Generally, boosters sold the stolen and fraudulently obtained merchandise to a "fence" at a fraction of the retail value.

9.      A "fence" was an organization or individual that received stolen and fraudulently obtained goods and merchandise to resell it for profit. The fence generally resold the stolen and fraudulently obtained goods and merchandise to third parties.

10.     McDANIEL operated several e-commerce stores on eBay.com, Mercari.com, and Whatnot.com (the "e-commerce stores"). The two eBay storefronts operated using the names "carolinacreme" and "infinitygaming," the Mercari storefront operated using the name "TreasureTrove," and the Whatnot storefront operated using the name "goldkingestates." Many of the retail products sold on the e-commerce storefronts were stolen or fraudulently obtained by boosters and purchased by McDANIEL, PRICE, or one of their coconspirators.

## The Conspiracy

11.     McDANIEL and PRICE, and their coconspirators, conspired to unlawfully enrich themselves by purchasing new products they knew to be stolen and fraudulently obtained from national retail stores, including, but not limited to, The Home Depot, Lowes, Target, and Best Buy, and selling those goods online at a discounted price to customers throughout the United States and several foreign countries.

12.     McDANIEL, PRICE, and their coconspirators' receipt, purchase, and subsequent sale of stolen and fraudulently obtained goods generally worked as follows:

   a.      McDANIEL operated as a fence, purchasing stolen and fraudulently obtained retail products from boosters in Hickory, North Carolina and elsewhere. PRICE assisted McDANIEL in purchasing the stolen and fraudulently obtained retail products from boosters.

   b.      The boosters delivered stolen retail products to McDANIEL, PRICE, and others working for McDANIEL, at TGK. McDANIEL and PRICE paid boosters a fraction of the retail price for the purchase of the retail products.

   c.      McDANIEL, PRICE, and others working for McDANIEL advertised the

2

stolen and fraudulently obtained retail products for sale on the e-commerce stores at prices significantly less than their retail value even though they were often described as "new."

    d.    Buyers throughout the United States and several foreign countries purchased these stolen and fraudulently obtained retail products from McDANIEL's e-commerce stores, paying for them with credit cards, PayPal, and Apple Pay, among others.

    e.    Upon receiving an order and payment, McDANIEL, PRICE, and their coconspirators transported, transmitted, and transferred, and caused to be transported, transmitted, and transferred, the stolen and fraudulently obtained retail products in interstate and foreign commerce through U.S. Mail or commercial delivery service.

    f.    McDANIEL resold the stolen and fraudulently obtained retail products for a profit and paid PRICE to sell the stolen and fraudulently obtained retail products.

13.    Between on or about January 1, 2020, and on or about December 31, 2020, McDANIEL sold and shipped, and caused to be sold and shipped, in interstate and foreign commerce more than $13,000 in stolen tools to buyers on the e-commerce stores.

14.    Between on or about January 1, 2021, and on or about December 31, 2021, McDANIEL and PRICE sold and shipped, and caused to be sold and shipped in interstate and foreign commerce more than $100,000 in stolen tools to buyers on the e-commerce stores.

15.    Between on or about January 1, 2022, and on or about December 31, 2022, McDANIEL and PRICE sold and shipped, and caused to be sold and shipped, in interstate and foreign commerce more than $135,000 in stolen tools to buyers on the e-commerce stores.

16.    Between on or about January 1, 2023, and on or about December 31, 2023, McDANIEL and PRICE sold and shipped, and caused to be sold and shipped, in interstate and foreign commerce more than $120,000 in stolen tools to buyers on the e-commerce stores. For example:

    a.    On or about April 20, 2023, J.S. stole a Makita Shaft Head Kit from The Home Depot in Statesville, North Carolina.

    b.    On or about April 20, 2023, J.S. sold the stolen Makita Shaft Head Kit to TGK in Hickory, North Carolina.

    c.    On or about April 20, 2023, McDANIEL, PRICE, and their coconspirators, posted, and caused the posting of, the stolen Makita Shaft Head Kit for sale on one of the e-commerce stores.

    d.    On or about April 30, 2023, a buyer in Florida purchased the stolen Makita Shaft Head Kit, which was then shipped from North Carolina to Florida.

3

17.     Between on or about January 1, 2024, and on or about December 31, 2024, McDANIEL and PRICE sold and shipped, and caused to be sold and shipped, in interstate commerce more than $90,000 in stolen tools to buyers on the e-commerce stores.  For example:

a.     On or about June 4, 2024, C.O. stole a Rigid Nailer, a Rigid impact driver, two Rigid drill sets, and a Rigid battery 2-pack from The Home Depot in Hickory, North Carolina.

b.     On or about June 4, 2024, C.O. sold the stolen Rigid Nailer, Rigid impact driver, two Rigid drill sets, and Rigid battery 2-pack to TGK in Hickory, North Carolina.

c.     On or about June 4, 2024, McDANIEL, PRICE, and their coconspirators, posted, and caused the posting of, the stolen Rigid Nailer, Rigid impact driver, two Rigid drill sets, and Rigid battery 2-pack for sale on one of the e-commerce stores.

d.     On or about June 7, 2024, a buyer in California purchased the stolen Rigid Nailer and Rigid battery 2-pack, which were then shipped from North Carolina to California.

e.     On or about June 7, 2024, a buyer in Florida purchased the stolen Rigid drill set which was then shipped from North Carolina to Florida.

f.     On or about June 7, 2024, a buyer in Texas purchased the stolen Rigid drill set which was then shipped from North Carolina to Texas.

g.     On or about June 7, 2024, a buyer in Georgia purchased the stolen Rigid impact driver which was then shipped from North Carolina to Georgia.

## COUNT ONE
### Conspiracy to Commit Interstate Transportation of Stolen Property
### (18 U.S.C. § 371)

18.     The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 17 of the Bill of Indictment, and further alleges that:

19.     Between in or about 2020, and in or about 2024, in Catawba County, within the Western District of North Carolina, and elsewhere, the defendants,

MARTY CHRISTOPHER McDANIEL

and

KENNY PRICE

did knowingly combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury, to commit an offense against the United States, namely to

4

unlawfully transport, transmit, and transfer in interstate commerce from North Carolina to states outside North Carolina, to several foreign countries, and elsewhere, stolen and fraudulently obtained goods, wares, and merchandise, having a value of $5,000 or more, knowing the same to have been fraudulently obtained and stolen, in violation of 18 U.S.C. § 2314.

## Object of the Conspiracy

20.     It was an object and purpose of the conspiracy for McDANIEL and PRICE to unlawfully enrich themselves by purchasing new products they knew to be stolen and fraudulently obtained from national retail stores, including, but not limited to, The Home Depot, Lowes, Target, and Best Buy, and selling those goods online at a discounted price to customers throughout the United States and several foreign countries.

## Manner and Means

21.     McDANIEL, PRICE, and others known and unknown, carried out the conspiracy in the manner and means described in paragraphs 11 and 12 of this Bill of Indictment, among others.

## Overt Acts

22.     In furtherance of the conspiracy and to achieve the purpose and objects thereof, McDANIEL, PRICE, and others known and unknown, committed at least one of the overt acts, among others, in paragraphs 13 through 17 of this Bill of Indictment.

All in violation of Title 18, United States Code Section 371

5

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

a. All property which constitutes or is derived from proceeds of the violations set forth in Count One of this Bill of Indictment; and

b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

The Grand Jury finds probable cause that the following property is subject to forfeiture on one or more of the grounds stated above:

a. a forfeiture money judgment in the amount of at least $589,489.55, such amount constituting the amount involved in the violations set forth in this Bill of Indictment;

b. The health and beauty products, electronic goods, firearms, and other items seized pursuant to a search warrant executed on or about June 10, 2024.

A TRUE BILL:

███████████████████

FOREPERSON

RUSS FERGUSON
UNITED STATES ATTORNEY

CARYN FINLEY
ASSISTANT UNITED STATES ATTORNEY